IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2014 Session

**STATE OF TENNESSEE v. BRENDA JUDY MOSS**

**Appeal from the Criminal Court for Putnam County**
**No. 12-0183     Leon C. Burns, Jr., Judge**

**No. M2013-01377-CCA-R3-CD - Filed August 27, 2014**

The Defendant, Brenda Judy Moss, pled guilty to theft over $60,000, a Class B felony, with the trial court to determine the length and manner of the sentence. The trial court subsequently ordered a ten-year split confinement sentence, with the Defendant to serve one year in jail followed by nine years of supervised probation. The Defendant asserts that the sentence is excessive and that split confinement was improper based upon the facts of the case. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J. and THOMAS T. WOODALL, J., joined.

William A. Cameron, Cookeville, Tennessee, for the appellant, Brenda Judy Moss.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Randy York, District Attorney General; and Beth Willis, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**
**I. Background and Facts**

A Putnam County grand jury indicted the Defendant for theft of property valued over $60,000, a Class B felony. On December 10, 2013, the Defendant entered a guilty plea to the indicted offense. A transcript of the guilty plea hearing is not included in the record on appeal.

At the sentencing hearing, the trial court admitted into evidence the presentence report, which contains the following recitation of the indictment against the Defendant:

> The grand jurors of Putnam County, Tennessee, duly empannelled [sic] and sworn upon their oath present that Brenda Judy Moss, between June 2009 and August 2011 in Putnam County, Tennessee and before the finding of this indictment did unlawfully and knowingly obtain or exercise control over property, including but not limited to; cash valued at over sisty [sic] thousand dollars ($60,000.00), belonging to Satellite Med with intent to deprive the owner thereof and without the owner's effective consent, in violation of T.C.A. 39-14-103, and against the peace and dignity of the State of Tennessee.

This report also provided the Defendant's statement about the offense, "I took money from my employer. Much to my shame. I don't know why I did except I did need money to pay bills. I deeply regret the people I hurt with what I did."

Jessie Rucker, a Tennessee Department of Correction probation officer, testified that she prepared the presentence report in this case. During the course of preparing the pre-sentence report, Ms. Rucker learned that the Defendant had no prior criminal record. Ms. Rucker testified that the Defendant passed a drug screen in December, was "retired," and was receiving $1,486 monthly in Social Security benefits. The Defendant reported health issues including diabetes and "back problems." The Defendant also reported that she lived with her husband and took "care of her grandson." At the time of the hearing, the Defendant had paid the court costs associated with this case.

Dr. James A. Cates, a physician, testified that he was the primary owner of Satellite Med in Cookeville, Tennessee. He recalled that Satellite Med opened on April 7, 2006, and that he hired the Defendant in January 2008 for an accounting position. Dr. Cates said that he was involved in the interview process and believed the Defendant to be trustworthy when he hired her. Dr. Cates explained that Satellite Med was set up to treat uninsured patients, which was discussed with the Defendant during her interview. Dr. Cates said that the Defendant was well aware of the challenges of bill collection for a clinic with the primary purpose of serving uninsured patients. Dr. Cates recalled that the Defendant had taken a leadership role in the clinic and had been promoted to the head of billing.

Dr. Cates testified that in January 2009, he noticed that "the cash flow was very short, and we were close to closing our doors." Dr. Cates said that he struggled with how "to keep the doors open." Nonetheless, he continued to praise the employees in billing for their hard work. As a result of the shortage, the clinic reduced employee hours to save money in an effort to continue providing treatment to the patients. Dr. Cates said that, during this time,

he never suspected that the Defendant was taking money.

Dr. Cates testified that he learned of the Defendant's conduct after she had left her work with the facility in August 2011. The Defendant's replacement, upon reviewing the records, began to notice discrepancies and multiple deposit slips for a transaction. After further investigation, Dr. Cates notified the district attorney's office and provided to that office a restitution amount of $111,374.19. Dr. Cates testified that $35,000 of this amount had been paid by his insurance carrier. Dr. Cates said that he had not yet received any restitution from the Defendant nor any type of apology for her actions. Dr. Cates requested that the trial court impose "the maximum sentence."

Monica Neal testified that she was currently the Accounts Receivable Manager at Satellite Med. She explained that she had replaced the Defendant. Ms. Neal said that she become aware of discrepancies in the accounting when a patient called one day complaining that the patient had not received credit for a payment. Ms. Neal began reviewing the history of the account and found that the Defendant was "making a duplicate deposit, keeping the cash, and putting the fake one with the receipts."

Ms. Neal explained the process for receiving money at the facility as follows:

In the front office, as well as in our medication dispensary, we would have cash drawers. The girls working the cash drawers would make a deposit slip at the end of the day from their receipts. They would have cash, checks, and credit cards. All of that was counted by a supervisor and that employee, put into a bank bag and locked into a cabinet. The next morning, it was given to the A.R. manager, which at the time was [the Defendant], and she made the deposits.

Once Ms. Neal found this first discrepancy, she began further research. She said that she took home banker boxes "every night, every weekend, [and would go] through it all . . . one by one." Ms. Neal confirmed that the amount of cash taken by the Defendant was $111,374.19.

Ms. Neal testified that the Defendant's conduct had a "terrible" effect on morale in the office. She said that, as a result of the cash flow issue, raises had been put on hold, hours had been cut back, and some employees had even sought positions elsewhere. She said she was "shocked" and "disappointed." Ms. Neal asked the trial court for the Defendant to be "prosecuted to the fullest extent."

The Defendant testified that she had expressed remorse about her "problem" to her

attorney and the Tennessee Bureau of Investigation ("TBI") agent who interviewed her. The Defendant confirmed that she has been diagnosed with carotid artery disease, Cephalalgia, dehydration, dermatitis, type II diabetes, hypertension, hypercholesterolemia, hypothyroidism, lumbago, thrush, endometriosis, hyperlipidemia, and cerebral vascular disease. She stated that she had "trouble walking." She confirmed that she had undergone cardiac surgery, four back surgeries, an appendectomy, two carpal tunnel releases and gastric bypass surgery.

The Defendant testified that she was sixty-five years old and received Social Security benefits. She said that she lived with her husband, who was sixty-nine years old, and her fourteen-year-old grandson. She testified that her husband also had extensive medical issues. The Defendant confirmed that she had brought $7,000 to court to pay toward restitution, and she intended to make regular payments toward the restitution.

The Defendant testified that she did not have anyone to care for her husband if she were away. She explained that he is "challenged by technology" and "can't keep up with his medications." She said that she also cooked and kept their house clean. Likewise, she was unsure of who would care for her grandson. About her offense, the Defendant stated:

> I'm - - I don't know what was wrong with me. Lord knows. I did a bad thing. I feel very, very sorry for it. I do apologize, if Dr. Cates wants to hear that. He is a good man, he and his wife, and I would hate to be any downfall to them. I just - - I - - I - - I don't know why I took the money, really and truly. I just was greedy or selfish. That's me. I've - - I've asked God to forgive me for that, so. And I really - - and I will try to pay back every penny I can.

The Defendant also expressed remorse in regard to her family because she had hurt her family "most of all." The Defendant confirmed that she had no criminal history.

On cross-examination, the Defendant testified that she had "a lot" of the medical issues her attorney had recited during the hearing at the time of her employment but that she was still able to work. She agreed that many of the surgeries were paid for through the insurance provided by her employment with Satellite Med. The Defendant agreed that she used some of the stolen money to renovate a bathroom and replace the roof on her house. The Defendant agreed that, over a two-year period, she took money "each and every time" she was to make a deposit.

After hearing the evidence, the trial court applied enhancement factor fourteen, that the Defendant abused a position of trust that significantly facilitated the commission of her offense. T.C.A. § 40-35-114(14) (2010). The trial court gave "little weight, if any" to

-4-

enhancement factor six, that the damage was particularly great. *Id*. at § 40-35-114(6). The trial court stated that enhancement factor seven, that the Defendant committed the offense to gratify her desire for excitement or pleasure, "could be considered." *Id*. at § 40-35-114(7). As to mitigating factors, the trial court found that the Defendant did not have a criminal record and that the conduct did not cause or threaten serious bodily injury. T.C.A. § 40-35-113(1) and (13). The trial court also noted that the Defendant had an employment record. The trial court then imposed a ten-year split confinement sentence, requiring the Defendant to serve one year in jail and the remaining nine years on supervised probation. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant argues that the trial court erroneously applied three enhancement factors:

(6) The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great;

(7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;

(14) The defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense;

T.C.A. § 40-35-114(6), (7), and (14). She also asserts that a sentence involving split confinement was improper based upon the facts of this case. The State responds that the trial court imposed a sentence consistent with the purposes and principles of the Sentencing Act and, therefore, asks this Court to affirm the trial court's sentence. We agree with the State.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Bise*, 380 S.W.3d at 682. A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should

uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Recently, our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence. The Court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *Caudle,* 388 S.W.3d at 278-79. We are also to recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2012); *State v. Taylor,* 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2012).

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) (201) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant who does not fall within this class of offenders, "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6). Additionally, we note that a trial court

is "not bound" by the advisory sentencing guidelines; rather, it "shall *consider*" them. T.C.A.§ 40-35-102(6) (emphasis added).

Even if a defendant is a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6), a trial court may deny an alternative sentence because:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103.

## A. Length of Sentence

Our review of the record reveals that the trial court applied enhancement factor fourteen, that the Defendant abused a position of private trust to accomplish the offense. T.C.A. § 40-35-114(14) (2010). The trial court also considered enhancement factor six, that the amount of damage was particularly great, and enhancement factor seven, that the Defendant committed the offense to gratify her desire for pleasure or excitement. T.C.A. 40-35-114(6) and (7).

The Defendant pled guilty to theft of property valued over $60,000, a Class B felony. The sentencing range for a Class B felony is eight to twelve years. The Defendant was hired to do accounting for a medical clinic that provided health care to uninsured patients. The Defendant was made aware of the facility's mission and the consequent difficulty with collection of payments. Based upon the Defendant's leadership in the facility, she was promoted to the head of bill collections where she oversaw all receivables and personally deposited any money paid by patients toward their accounts. Over the two-year course of her employment, the Defendant repeatedly created false deposit slips and retained portions of the money received from uninsured patients. As a result of the reduction in cash flow, employee hours were reduced, raises were frozen, and there arose the possibility of closure. All the while, the Defendant continued to take funds from the facility totaling $111, 374.19. While trying to keep the facility open to serve uninsured patients, the primary owner, Dr. Cates, said

that he never considered that the money issue was related to the Defendant; he testified that he "trusted" her. The Defendant could not recall all of the uses for the stolen money but used some of the funds to renovate her bathroom and put a new roof on her house.

These facts support the trial court's finding that the Defendant abused her position of trust overseeing bill collection for a medical facility to steal cash from patients submitting payment for bills. The Defendant was promoted on the basis of her leadership. The Defendant was trusted to collect and deposit all money paid toward patient bills. Her access and control over these monies provided her with opportunity to take patient payments. Accordingly, the trial court did not abuse its discretion in applying enhancement factor fourteen.

It is unclear from the transcript of the sentencing hearing whether or not the trial court actually applied enhancement factor (6) and enhancement factor (7), although both were considered. Enhancement factor (6) may apply when the amount of the damage was particularly great. After noting that the "sizeable amount" of money taken was "near twice the amount above the sixty thousand ($60,000.00) factor that makes it a 'B' felony," the trial court gave "little, if any, weight" to this factor. This Court has previously held that "since the punishment for theft is enhanced based upon the amount taken by the accused, use of this enhancement factor constitutes double enhancement in violation of the statute." *State v. Grissom*, 956 S.W.2d 514, 518 (Tenn. Crim. App. 1997). In this case, as the trial court noted, the Defendant took $111,374.19, which is almost twice the $60,000.00 required to constitute a Class B felony theft of property. "This Court has held this enhancement factor applicable in a case where the theft offense involved $52,000-an amount of money approaching the $60,000 amount necessary to put the offense into the next grade of theft and where the 'losses suffered by the [victim business] owners from the defendant's criminal conduct were particularly damaging.'" *Id*. at 518 n. 4 (citing *State v. Frank*, No. 03C01-9209-CR-00303, 1993 WL 539401, at *4 (Tenn. Crim. App., at Knoxville, Dec. 22, 1993)). Additionally, evidence was presented that employees did not receive raises and hours were reduced because of the Defendant's criminal conduct. Under those circumstances, we conclude that the application of this enhancement factor by the trial court would be appropriate.

The trial court also considered enhancement factor (7), that the Defendant committed the offense to gratify her desire for excitement or pleasure. As to this offense the trial court stated:

> I don't know that that's applicable. Generally, that factor is attempted to be applied to sex offenses . . . . But Ms. Moss has said that she redid her bathroom, fixed her roof, people have talked about her talking about vacations. In other words, generally living the good life on somebody else's money. It

-8-

seems to me that that is a factor that could be considered."

Although it is unclear whether the trial court actually applied the factor, we conclude that under the facts of this case, enhancement factor (7) would not be applicable. While enhancement factor (7) is often used to enhance sentences for offenses that are of a sexual nature, we note that it may also be applied to enhance the sentences of other offenders, such as one "who steals because of a pleasure experienced in 'not getting caught[,]'" provided the State produces evidence of the factor. *Id*. at 490; *See State v. James Allen Bailey*, No. E2001-02443-CCA-R3-CD, 2002 WL 2012652, at *3 (Tenn. Crim. App., at Knoxville, Aug. 28, 2002), *no Tenn. R. App. P. 11 application filed* (finding that enhancement factor (7) applied to enhance a sentence for arson where the defendant indicated he relieved his frustrations by committing the offenses and returned to the scene to watch the fires.).

In the instant case, the Defendant took uninsured patients' money "each and every time" she made a deposit over the course of a two year period. To hide her criminal acts she created a system of duplicate deposit slips. She testified that she used the stolen money to renovate her bathroom and described herself as "greedy and selfish." There was, however, no evidence that the Defendant stole to gratify her desire for excitement or pleasure. Therefore, we find that the evidence would not support the application of enhancement factor (7).

As previously stated, a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Our review of the record reveals that the trial court followed the purposes and principles of the Sentencing Act when it applied a sentence within the appropriate sentencing range. The Defendant has not carried her burden of showing that the trial court's sentence is improper and, therefore, is not entitled to relief.

### B. Split Confinement

As to the Defendant's second issue that split confinement is improper, the Defendant makes no argument in her brief regarding this issue and makes no showing as to the trial court's alleged abuse of discretion in ordering split confinement.

The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The rules of this Court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record

will be treated as waived in this court."). We deem this issue waived due to the Defendant's failure to make any argument as to how the trial court abused its discretion in ordering split confinement and the Defendant's failure to cite to any legal authorities supporting her position.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE